The next case on our docket is Doherty v. National Board of Medical Examiners. Good morning. May it please the court, I am Eric Wolf. I am counsel for the National Board of Medical Examiners. With me is Bob Burgoyne and Allison Kaditz. The preliminary injunction in this case should be reversed because it is an abuse of discretion for several reasons, but the clearest reason is that the plaintiff does not satisfy the standard for a disability, which is substantial limitation in reading compared to most people in the general population. The plaintiff scored in the 99th percentile on the ACT without accommodation, scored in the 88th percentile on the MCAT without accommodation. To kind of go through this, I want to first talk about the standard, then I'll talk about the evidence that was heard at the preliminary injunction hearing, and then I'll talk about the various arguments that are being made about that. Before you do that, I would kind of like to understand where we are right now. She took the test in September? She took it August 6th. I'm sorry, and the results were available in September? The results became available by the end of August. So does she know the results of her test? She does not, and I do not, but she's taken it and there are the results. But the board does not want to release it to anybody, including her? Correct. So what you want to happen is for her to take the test again when? So the step tests, these tests, they're not like the bar exam or the LSAT. It's not like they're only sort of two times in the year. There are lots of different times you could take it. At the hearing, she testified that within 300 miles of where she lives, there were like five different places she could take it. The date she chose, August 6th, that was her date. She testified, and just to be clear, at the preliminary injunction hearing, the only evidence was plaintiff's testimony. That was it. There were no experts or anything else. It was a hearing two days after we were served with the temporary restraining order application, and it was just plaintiff testifying. So everything I'm recounting is plaintiff's testimony. So she testified that she picked August 6th because she thought that would set her up to have all of her paperwork done before September 15th, which is when this residency match thing opens up. Okay. When's the next residency matching thing? So it's open right now, and the whole process will repeat. In her case, she testified that— It's open right now. It will repeat when? I can get you a firm answer on that on rebuttal. I can talk to Mr. Burgoyne, who will have a firm answer on that. But here's the issue for plaintiff. She's actually in the process—I mean, you'll have to ask her counsel about that, but my understanding is—this is all outside the record now, but my understanding is she's actually in the process now. Like, she's submitted. She just doesn't have her score yet, and she's interested in a residency at Tulane, and she can apply to Tulane even without a score. This all goes to why we argued there was no irreparable harm. She can apply, but in deciding whether you get in, is the score going to matter? She ultimately needs a score. She needs to graduate, which she can't do without a score. Correct. So I'm trying to get at where are we in the process. When can she next take an exam that would get her into a matching— I'm just trying to figure out where we are. I'm not making any judgment about it. Yeah, yeah. Would you like me to talk to Mr. Burgoyne now, or should I come back? You can cover that alone. So the important point, and I did not plot out precise answers to this, but the important point is it's not like the bar exam. Like, there are multiple opportunities for her to take the exam. You sit in, like, a cubicle that's on a computer, and she can take it again. I mean, it's possible she could take it within the next couple weeks if she needed to. Okay, so if we were to reverse and remand today, what would happen next? I think that's where we're trying to go. What would happen next? She would set up a date to go take the exam without accommodation, and she would get her score. Her score was ready within a month, so she— And how often—I know it's not the bar exam, but I don't imagine that they have these every day. How often, roughly, do they have these things available, like if we remanded today? It's ongoing testing, not quite daily but close to it. Okay. It's a question of available testing time and third-party test vendors doing computer-based testing. And I assume she testified there were, like, five different places within 300 miles of New Orleans. You know, if she were willing, say, to go to Houston or something like that, there would be even more. Okay, so if we reverse and remanded today, which is what you're asking us to do, in essence, within a few weeks she could go take the test, and then a month after that she'd have the score. Yes. When is the last day that she must have the score in order to finish out with Tulane, whatever she's trying to do with them, and graduate? In the Tulane handbook it says, I believe, it's December 30th. I'm sorry, I do need to rely on Mr. McClary. I think she has to verify her credentials for the match, either February or March of 2020, which would include her STEP score, and that would also be in time for graduation purposes. Okay. But the Tulane manual recommends taking the test before the end of the year. But what I'm wondering is, I'm not sure that the reverse and remand would necessarily be that she doesn't prevail on her claim. It would simply be that she didn't support her preliminary injunction on the record before us. Because it has to do with, so here we are to where this really, the rubber meets the road, so to speak, the general population definition. If we were to say, well, the general population is something other than it was defined in the district court, wouldn't she still have an opportunity to come in and say she meets that definition, whatever it is? I think yes, although, and she could certainly attempt to pursue this through summary judgment, or she could ask for some kind of expedited proceeding. But just to be clear, Your Honor, what happened here in dealing with this by way of preliminary injunction practice is not to be recommended. What happened here was pretty messed up, quite frankly. In a matter of days, with the entire thing under seal, this hearing is held as just plaintiff's testimony. If you go into these scores and these reports, that all requires expert testimony. And lo and behold, district court gets confused. Like the district court gets this Nelson Denny reading test score that says she's the sixth percentile in reading rate. And the court just lifts that up off the paper and says, well, look at that. I mean, she's in the sixth percentile. The court erroneously says in its order that that's in the general population. And the 6% was college educated? College graduates. College graduates. College graduates. College educated. I'm trying to understand your position on what is a score that can be used to assess someone's reading ability in the population as a whole. I think your main argument is what we just talked about, which is it has to be at various education levels. So college graduates is not the population as a whole. I mean, I get that. I understand that. But you also seem to be making an age argument. And I don't really understand that, because let's say hypothetically there was a test every 35-year-old took. Right. And someone scores bottom 5%. Mm-hmm. Wouldn't that mean they're in the bottom 5% of all adults? I mean, there's nothing that says 35-year-olds read better or worse than 40-year-olds or 28-year-olds that I'm aware of. Yeah, that would be a lot closer, Your Honor. If it were just like what you hypothesized, that would be a lot closer. Okay, but I read your briefing that you're also making an age point, not just an education level point, that these tests weren't a broader age population. Correct. The problem is there's this overlap of age and college education based on the pools. And in your record at RA 662, you have an excellent article by a researcher in this area named Allison Harrison that kind of goes through this problem with the pools. And so if I could just talk about this sixth percentile test. So there are just all kinds of problems with this test. So it's a one-minute reading test. It's basically on your honor. So you start out. It's 41 lines long. You start out. You're going. They start the time. You stop, and you're supposed to put your finger down where you stopped. That's the entirety of the test. Easily feigned, as the article points out. Like, this is easily manipulated. But her sixth percentile among college graduates, if you go to the larger norming pools, like if you go from everyone 12th grade and above who's been part of that Nelson Denny reading pool, she would still come out about average. I mean, and that assumes maybe even if she's manipulating or something like that, she's still averaging the broader pool. So to go back to your question about pools, in the Nelson Denny reading test and some of these others where they have you at grade level, you can take the raw score and look at it in the bigger pool. And that's what an expert would do if you were having, say, a summary judgment proceeding or something like that. I'm looking at the, what is it, the WIAT retest where it says, which I don't think the district court actually cited this, but the other side's relying on this statement that 90% of students in the normative sample scored higher. But I have trouble looking at the individual breakdown of seeing where that 90% comes from. I have no idea. No idea. And so that's your point, it's something maybe experts can flush out? Absolutely need an expert. So our reply brief, we have a very long footnote. It's footnote two that goes through the individual scores. I have no idea where that 90% comes from. Because it's not consistent. Oh, go ahead. It is inconsistent. I mean, I was going to ask, I'm just wondering, is the problem here, I mean, we obviously need to define what general population is. But I'm wondering if the problem is y'all were basically given no notice, you're just running down to the courthouse trying to deal with a case you just found out about, you know, the day before. And so it's very willy-nilly and, you know, not a lot of detail and room for the district court to become confused. But were that not the case, were y'all to have a little bit more time, bring in experts and so forth, might we still get to the same place she got where she is entitled to rely upon the test she took with the accommodation? So I will give you the legally correct answer and then I'll give you my assessment of this record and what you have. Legally, yes, that's right. So the door would still be open. Who knows? Maybe she can bring in evidence that would be persuasive. Given her record, no way. No way. Her numbers, her record, she is the least compelling plaintiff of any of the disability cases cited in the briefing. So these other cases being cited, like, for example, the opinion from the Southern District of New York that then Judge Sotomayor had, that was a 21-day bench trial with loads of expert and clinical testimony, and that was an individual who could only read by using a device. It was an index card with, like, an opening in it. Okay, 99th percent. So the closest she came to, like, a big normed pool was when she took the ACT. She was in the 99th percentile. People who have real reading disabilities where they're limited compared to most people don't score in the 99th percentile on the ACT. Practically. That's all multiple choice, isn't it? But it's a lot of reading. It's a lot of reading. Multiple choice. It's not like you read a half a page and then it's short questions. Some of the questions are, but they're reading comprehension questions. And the MCAT, so you have sample MCAT questions at 226, RA 226. She scored in the 88th percentile on the MCAT. Her highest section was verbal reasoning. That sample question text is nearly the full page. So somebody who is substantially limited in reading compared to most people in the population cannot get that score. That's a fact issue. We can't resolve that. Your Honor, I don't think we have to set aside our common sense at the courthouse door. I mean, we've all taken these exams. I mean, not the MCAT in my case. Can I just, because time is running out, I want to jump ahead to irreparable injury. This maybe goes back to the discussion at the beginning. It does seem like if we vacated the injunction that there would not be enough time on remand to have a full trial. And if she wins, to take the test and get the score before some of these end-of-year approximate deadlines you're talking about. And so I think your argument on irreparable injury is, well, okay, at worst she has to wait a year and apply for residency. I mean, that seems to me a really narrow view of irreparable injury. A year of someone's professional life isn't irreparable? Well, I mean, the Tenth Circuit in Rothberg was talking about the LSAT. And they were like, having to wait a year to go to law school is not irreparable injury. Yeah, it does seem to me there's a divide in the case law where getting into school, they generally say, is not an irreparable injury. But that sort of makes sense because, you know, you can go get a job. But then the cases seem to say, once you're in school and it's this sort of getting your, in this case, your residency. I mean, there it's like, what does she do for a year? You know, you can't go work in a lawyer's office. I mean, you theoretically could, but it's a much more disruptive thing, I would think. We don't have anything in the record about how disruptive it would be. And compared to the other cases, so the other cases that she wishes to rely on, you had people who had, like, failed the bar exam multiple times. So it's really almost do or die whether you're going to be a lawyer. People who are facing getting kicked out of medical school, which she is not facing. I mean, she could leave this hearing and go sign up to take it without accommodation. And she could have done that from, you know, the timely. But if she gets a significantly lower score on that test than the one she got with accommodation, she might not get the Tulane job. Okay. She passed Step 1 without accommodation. So she's already taken one of the medical licensing exams, and she passed. And she doesn't like that score. It's too low. And at the hearing, she and her counsel got out these charts. You may remember these from applying to law school. And they take, like, your score, and then they show you kind of the mean score of people in certain residencies. And she's like, well, I can't get the residency I want with this score. I need a higher score. Her applications were very candid about saying, I just want a higher score so that I can get the residency that I want. And that's not good enough in your view? That can't. Can she get the job at ‑‑ can she get the residency at Tulane if she simply passes Step 2 and doesn't, you know, blow it out of the park? I don't know. But that is the kind of ‑‑ so just to get back to the compared to most people. I mean, what the district court seemed to understand, what they've advocated for, what her psychologist advocates for is this it's just me against my potential standard. Well, I mean, isn't it true that anybody given more time would probably do better on the test? You got it. That's exactly right. That's exactly right. Like, I don't think it's unique to her. So if we just took someone who has no claim whatsoever of any disability and gave them 50% more time versus their original score, would the bulk of those people do better? MBME gets thousands of applications for more time. Everybody wants more time. Thank you. Good morning, Your Honors. Rick Stanley here for Megan Doherty. The core issue before this court is whether the district court abused its discretion on this record in granting the preliminary injunction. That includes a legal question of what general population means. Absolutely. In the Stanova review. And, Judge, and I want to be clear about this. The statute does not talk about general population. The general population standard is introduced in the regulations, which are the Department of Justice regulations. And if you're going to go with the regulations. Do you accept that standard or not? I do. I do. I do accept the standard because it's in the regulations. But the regulations also have plenty of things that are very good for our case that the other side doesn't address. The regulations are very clear that the standard for disability is meant to be expansive, that the test for substantially limited. Going back to the population question, do you also agree the 6% score was just comparing her to college graduates? The Nelson-Denny test, yes. In the Wyatt-3 tests, it's against the population, her age. The Wyatt-3, that's the question I had about where the 90%, you know, worse than 90%. And if you can illuminate me onto that, that would be helpful. The other thing about that test, though, I didn't see where the district court relied on that test. The district court only cited the 6% score in its order. Is that right? Right. Dr. Brockman relied on both, and I believe he relied on Dr. Brockman. So tell me how you – where does that – I mean, I see it. I have the results right here. It does say 90% scored higher, but then you look at the components, and I don't see anything close to bottom 10%. I think we're looking at the record at, I think, 661.282 is the page number in the record. We're at the top of the page of the Wyatt-3. It talks about word reading speed and says the score is the saver higher than the scores obtained by 10% of the students. 90% scored higher. And then the pseudoword decoding scores the saver higher, obtained by 25%. 75% in the sample scored higher. Now, you look down into the tables and how you interpret from the tables to that percentage is something that a psychologist can do but I cannot do. I couldn't look at the tables and get there either, but I take it from the fact that this is an accurate report of the Wyatt-3 and that Dr. Brockman relied on it as a significant finding that this is the medical evidence, if you will, that she has an impairment. She has an impairment in reading and decoding and comprehension. And in fact, that was conceded in the district court by Mr. Burgoyne, and that's at page 102 of the transcript. Do we know, is this report we're looking at the Wyatt-3, is that you just run the scores through a computer and a computer spits this out? Or is where it says word reading speed in those couple sentences, is that the, Dr. Brockman's typing that in? I don't know the answer, but it was my supposition that it's the Wyatt-3 computer scoring and that Dr. Brockman then uses that. It does seem all this could be fleshed out if Dr. Brockman had testified. Well, that's true. She did not testify and it was a short hearing. You know, in the district court. Because I can imagine getting a phone call that my client's got some preliminary injunction tomorrow and I've got to run down there and defend it. That's kind of hard to do. So in terms of getting experts so that all of us in the district court and the court on appeal can understand all of this stuff that we don't live every day taking Wyatt-3s, at least I don't. Isn't that, I mean, that was her choice apparently to pick August 6th and therefore create this rush, rush to judgment, that avoided having expert testimony to help everybody understand where she really fits in whatever general population we're talking about. I have several responses to that. First, the August 6th date was to match up with the fact that September 15th is the application date for residencies. So that was a date late actually to take it so that you get your score in time to submit it for September 15th. In terms of the NBME not knowing its position on Ms. Doherty and why she should not get accommodations, I heard opposing counsel say, well, she's easily the least deserving candidate I've seen. It took them 70 days to make that determination. They got the application back in April and they didn't tell her what their determination was for quite some time. They say the delay was their fault. The delay was definitely on their side in that timeline. And then the third response to that is there's nothing in the record where they told the district court, can we have extra time to submit an expert? If we submitted an expert or we submit our own evaluation, we'll be able to rebut all this. But almost more importantly than that, going back to these Justice Department regulations, they are very clear about the point that outcomes and test scores are not to be determinative evidence of whether an impairment equals a disability. That they may be relevant, but they're not determinative. And in fact, I cite the court in our brief to Appendix C of those regulations. But the district court relied on the test scores primarily. The district court did look at the test scores, but also found that Ms. Doherty's own testimony about her experience was credible in all respects. And the fact that she did not seek accommodations coming up through school, in fact, we don't have a plaintiff here who is anxious to get accommodations. She didn't get them because she wanted them. She got them because she needed them. She got to the point in her career. She started doing not as well as she had academically, but that's a fairly common, you know, in high school you do this well, and then you're at a more competitive college environment, and then you're in a more competitive graduate school environment. So that's a common progression to not do as well at each higher stage of education. That may be true, Judge, and that's why these cases are a little bit difficult in terms of looking at the evidence. But the truth of the matter is that I would analogize it to having a four-speed transmission. Most people can read with a four-speed transmission. So if they're reading something simple like the comics, they're in first gear, second gear, and you can get pretty far going up to third gear. But when you get into an environment where you have to be in fourth gear because there's a lot of reading in order to answer the question, to understand and answer the question, if you have a reading impairment, that's where it's going to show up. And that's what happened to Ms. Dougherty. She did not ask for accommodations until she got to the point where she had to answer these long vignette-style questions where you have eight or nine sentences followed by as many as 10 or 15 multiple choices in order to make a diagnosis. And when she hit that in medical school and she saw that these tests were really displaying her disability, not her knowledge, because meanwhile she's taking other tests orally or with short questions, and she's doing fine. But the longer questions are where her disability gets shown. And so it's at that point, for the first time in her life, she says, I recognize that I need to ask for an accommodation. We don't have somebody here who is trying to game the system. Okay. We still have to deal with general population length. Yes. So where do you have to be within the general population to be disabled? Well, I have to say there has to be some discretion in the court to view that on a case-by-case basis, because general population I don't think would include infants or would it include people who may be illiterate. Obviously it's not fair to compare them against. And the tests that we're looking at, I'll admit, they're not ideal. Nelson Denny is college graduates. Wyatt Three is a broader spectrum. It's students her age, which is a little bit broader, but it's still students her age. I am unaware of any test that is administered to the entire population by which a psychologist can look at it and say, well, there is objective evidence. But what the regulations tell us – Well, high school standardized tests. I mean, like in Texas there's a test every single public high school student in Texas has to take, from people who are going to Harvard to people who are not going to graduate high school. But I don't think those tests are geared to test disabilities. But these aren't either. I thought these were just reading tests. Well, and that's – Wyatt Three. And, again, that's why I refer the court to the Justice Department explanation of this about relying on these testing outcomes, because that was actually proposed. But what other evidence is there in addition to the Wyatt Three, we're not going to rely on that exclusively, that puts her in the general population on some – you haven't answered my question. Where would it be low enough in the general population to come within the regulation, number one? And, number two, where is that evidence? I think the evidence that she reads at a pace slower, her processing speed and her reading comprehension is slower than the general population, which I would put at a 50%. What general population are we talking about? Well, the general population would be, I would say, adults who are fairly educated enough to read. And the way you can prove that is simply through her testimony, her obstacles, what happened to her at Tulane Medical School, and the professionals, the professional assessments, and the regulations make it clear that they are to be – I wouldn't say that, Judge. You said we compare based on 50%. If 50% of the population, using my transmission example, could only go up to second gear, then maybe 50% would be disabled. My argument – My gosh. My argument – Doesn't that seem a little inconsistent with – because then the whole test should just be taking longer. I mean, just then the test time is wrong. Or, alternatively, if half the people are having trouble with the test, that will show up in how the test score is weighted. You know, if I take a test against people and I don't do very well but everybody else does worse, I may still get an A in a class that I didn't know anything about because everybody else knew even less than I did. General population, unfortunately, is not defined in the regulations. And you can see the court struggling with it. And some do use Nelson Denny as a proxy, and some use other psychological tests as a proxy. They use the testimony of the plaintiff as a proxy. They also use this idea of having the expert evaluators as a proxy. It is the best we can do to apply the standard we're given in this circumstance. But I need to also make this point. We can't just have some vague thing that how does the district court feel about this person is good enough because that completely undercuts. Yes, I understand it's an expansive test, but it's also a highly critical thing because if she gets more time and therefore does a better score, then she could supplant someone who didn't get the more time and got a worse score because they would have benefited. Everybody would have benefited from more time. I think we can agree with that. Everybody but maybe one or two who are just quick thinkers and that's it. They just don't need the extra time. But most people would benefit from more time on any test. I respectfully disagree in this context with this test. There is no dispute in this record that this test is a mastery test, and therefore you either know the material or you don't. Why is there any time limit then? Well, I don't know. I didn't construct the test. There is a time limit. Because when you read something fast, you miss things. Have you not ever done that? You read the opponent's brief pretty fast and you miss a whole paragraph where they made the point that you thought they didn't make versus you go back and you really study paragraph by paragraph, and we've all done that. Read a case quickly or read something quickly, an article in the newspaper, and you miss, oh, I missed that sentence that your spouse then points out or something like that. When you have a lot of time, you have this whole page to read, and you have a lot of time to read it, you will absorb more. That's the whole idea of speed reading and testing you on speed reading. It's not did I see the words, but did I absorb what those words were saying. I understand, Judge Rachel, but this was not designed to test how fast you read. Well, then they should give everybody more time and we're done. Well, again, I'm not writing their test for them, but in a situation where you're giving someone a long vignette and they don't have time, and this is the testimony unrebutted in the district court record. She can't finish the question in order to answer the question appropriately, and if she was given additional time, as she was at Tulane Med School, with the same type of questions, she can. I thought you said she didn't get additional time before. At Tulane, she did. Yes, she applied for it and did. Do you want to address the what ifs? So obviously if we affirm, we know what happens then, but what if we were to reverse because we concluded that as a matter of law the judge failed to apply the proper test for what the general population is? Then what would happen? She would have to go back and try to either go to court and establish her case with more evidence, which I don't think she would be able to do within the time frames of how this entire process works, or she would have to try to take this particular step two test without accommodations and hope for the best. And even then, she would have to submit those scores. She's late in submitting those scores, and this is outside of the record, but we were sort of invited to talk about it. She has submitted 49 applications. She has been rejected by nine, and the only interview she has been given is at Tulane, which she was guaranteed to get. Which is what she wants, though. That's the place she wants to go. Well, but there's no guarantee she's going to be accepted into the program, of course, but she was guaranteed the interview. So of the schools that have responded, nine have said, no, you're not getting an interview. And with each passing day, more interview slots are going away. So in essence, what she's really looking at, if this court says go back and do it over, is waiting a year. And what would she do in that year if that happened? For whatever reason that year existed, what is available to her to do that relates to the medical profession? I do not know that answer. Internships similar to being a law intern, like when you're in law school and you're an intern, say I have an intern in my court right now, that kind of thing. I just don't know the answer to that. So as of today, she's only got one interview. The Tulane interview that she was guaranteed because she attends Tulane, yes. And when does she need to get them the score for them to be able to confirm her if they want her? Well, Tulane, she has to get the score in in order to graduate, and so I think that that's a deadline of December 30th. There's another step two test that she took without accommodation because that was a clinical test where it didn't have the long vignette, so she did not request an accommodation for that test. And she already took that? She took that. She passed that? I don't know if she passed it, but she's taken it. Okay. Now, we had this exchange with counsel opposite about when she could take it, so if we reverse and remand it today, and I'm not suggesting we will, but I'm just saying if, then when would she be able to take this test again? I would say she'd have to get an application permit that she has to get that she can register for the test, so probably within the next three weeks, and then there would be three weeks after that to get the score. And that's estimating based on what I've read in the record, having not been through this process myself. Why was the case filed under seal in the district court? Megan has been sensitive to the fact that she doesn't want to be regarded as impaired and did not want to go into residency interviews telling schools that she has a reading and decoding impairment, so she would have preferred not to have that publicized. So procedurally, was there a motion to seal? Yes. And it was granted before the other side? Yes. And on my advice in this appeal, I said, I think you're going to need to tell the schools anyway, and if you gain the accommodation, then you need to understand it. So we should move to lift the seal and not operate under that burden. I can't emphasize enough that the regulations are intended to be expansive, and it may cause all of us a pause to read them that way, but they're very clear, and in particular, Appendix C is clear. Testing agencies like the NBME went to the DOJ and attempted to insert the idea that these testing outcomes that we've heard so much about should be determinative, and the Department of Justice specifically said we declined to do that because it's inconsistent with congressional intent. And the idea that a high-achieving student like Megan must either constantly request accommodations or lose them at some point in her career when she really needs them is inconsistent. Test scores certainly aren't everything. If you have someone who's been diagnosed with dyslexia since the time they were 4 years old, there's a host of things that go into it, but it just seems like here the test scores really were the basis for the injunction. So, I mean, that... I guess I read the district perhaps because the transcript indicated the judge asking questions, and I thought he went deeper than just the test scores, and perhaps the opinion, you know, gave that impression. But I got the impression from reading the transcript and the opinion in tandem that the judge took the whole thing, and, of course, it was quick because... There's a lot of these testing cases out there. Which one do you think helps you the most? I think the Bartlett case and the Berger case. The Berger case, of course, is the one that's on appeal, I think, now to the Sixth Circuit. But the Bartlett case out of New York and the Berger case, I think, are both good. Unless your honors have any further questions for me. Chief Judge Owen, I just want to apologize for not being prepared to answer the timing question out of the box. So, being able to talk with Mr. Burgoyne, the match occurs in March 2020, and between now and then she should have enough time to get a new testing date, possibly in a matter of weeks, and take it without accommodation to participate in this year's match. But what about the December 30 graduation deadline? She's not graduating on December 30. No, but they said the deadline for getting the test in order that she can graduate is December 30. Tulane recommends you take the test before December. Take the test before, not get the score before. Correct. Okay. And the September 15th, that's when this opened. And one of the issues in these cases is you don't want to be – I don't want to be derogatory toward a student who's trying the best she can and wants to do well. That's great. And so she set this up to kind of have her ducks in order when this thing opened to hopefully have a better score with accommodation and do really well in the residency match. And that's – she's been very clear about that in her testimony and in her application for an accommodation that she wants to get the best score she can get. So this argument about, well, it's just a mastery exam, it's kind of pass-fail, for purposes of medical licensing, that's true. We don't want anybody to be a doctor who can't pass these tests. I mean, we really don't want doctors who can't pass these tests. But that's not what's before you. What's before you is an individual who wants a higher score, and she was very clear about that in the district. And how does disability play in that? Because we know, for example – I mean, I'm much more familiar with the LSAT. There isn't really a pass-fail on the LSAT. You get a score. But that score will determine what law school, in part, but in a large part, what law school you can go to. And in turn, the law school you go to can have a significant impact on the job you get. Not all jobs. You can still put up a shingle and say law offices of Katharina Haynes, as long as I can pass the bar. But getting a job at certain firms and other places, U.S. attorney's offices, kinds of things, it can matter. So where does the concept of the Disability Act figure in that, getting into Harvard versus getting into the neighborhood night school? When you're in this, you know, we're down in sort of the smallest pool here. It's going to be very difficult for somebody who's getting the kind of scores she is getting on the ACT and the MCAT to ever make a showing. Well, you're not an expert, with due respect. No, I am. I'm not. I'm sorry. I'm sorry. I'm not. I'm not. You do not have expert testimony. You keep arguing the facts here. We can't go there. With great respect, that's not for us to decide here. We need to decide what general population means, whether there's evidence in this record that supports general population, if there are other regulations that shed light on this, and that's where we need your help as a lawyer, not here to argue about her individual case. I will put that to one side. So on the question of— Doesn't it seem that someone who is very high-achieving academically— I'm just speaking hypothetically. In other words, let's say someone's 5% in reading, but they're 5% on everything. They're just not an intellectually gifted person. But then you have someone who knocks it off the charts in science and math and all these other things, but reading is really low. Maybe reading is only 25%, but in context, that could be more indicative of a reading disability, given what a departure it is from their other academic abilities. Correct. So I do not want to be heard as saying somebody with these scores could never, because your example is a good one. And keep in mind, in the amendments, they made it clear that you're not supposed to take into account certain mitigating measures. So let's say you had a device or a particular technique or whatnot. The plaintiff in Bartlett had this card she used to kind of focus in on as she went along. It was an extremely slow reader, failed the bar exam multiple times. Let's say, oh, we're going to take away that card. We know that without the card, she definitely is below most people. So you could have a situation where somebody with their device can get an acceptable score, but if you tested them without the device, there's no way they could get it, even though they would do quite well otherwise. That would be a much different situation. You asked, you know, give me the cases that you would compare your client to, and counsel said Bartlett and Berger, and Ms. Dougherty does not compare favorably to either of them. I mean, Bartlett, first of all, evidentiary-wise, evidence-wise, you had a much fuller record there. You had a 21-day bench trial in Bartlett, but just the two individuals had much more to overcome. So I've asked what would happen if we reversed and remanded today. What if we affirmed? Would you then release the test score? I think that, yeah, I guess we'd release the score, and then it would be up to NBME. And then, just to be clear, we'd release the score. And we don't know what that is. Maybe she failed with the accommodation. Maybe she did really well with the accommodation. We don't know. Just to be clear, if we release the score, then the harm is done to other candidates, right? Because then if that score was unfair, she can beat somebody. And it's not just people who didn't get accommodations. She could beat the student who has dyslexia or who reads with the device, who would qualify for an accommodation every single time. And then somebody who doesn't deserve one could potentially beat them. So we would release her score, and then it would be up to NBME whether to go back and fully litigate it. NBME is, there's no, nobody takes any joy in turning down accommodations. But NBME, as the ADA even talks about, we need a national, uniform, consistent standard. That's what the most people in the general population standard is. And NBME's interest is, like, consistent standards across disciplines. What is your standard? What is your standard? For people who clearly have ADHD, reading disabilities, what is your standard? Most people in the general population. And what tests do you use? These tests can work to assess that, but you need to understand the pools. I'm asking you, tell me what evidence you would put on, you would say, yeah, in your standards, this person has taken this, this, and this test and scored this. What do you rely on? So I think a district court can put a lot of weight. Not the district court. What do you at the testing level, when you get people? Your company. Oh, sure. So in a case such as this, the ACT and the MCAT receive far more weight, because she's motivated to do well on those exams. She took them without accommodation, and she scored extremely well. And then on the other side, you have these tests that are taken because, you know, you make a private appointment with a psychologist and pay, you know, whatever, $3,000 to $5,000, and the whole point of that is to try to get an accommodation. And so you sit and take the Nelson-Denny reading rate test, and, you know, okay, clock starts, and you go, okay, where did you stop? Finger down. So if they had done that to get the MCAT and the ACT, they'd gone to the professional and gotten time, extra time, then you'd say, okay, you get extra time here. It would have helped her case if she had gotten an accommodation earlier, and if she had, if in a situation. So you're relying on the ACT and the LSAT people to decide accommodations. You're not independently going to assess it yourself. Well, we assess the application that comes to us, which came to us from her. So she packaged up her materials, filled out a form. She had a personal statement, which is in your record. The bottom line, if you don't get accommodation on the ACT or the LSAT, you don't get accommodation on your records. No, I just think it's not going to be as compelling. What is compelling? What other than the ACT and SAT, LSAT? I think a compelling case would be, as was suggested about the Texas statewide testing, like somebody with a learning disability. In the real world. In the real world. What does your client, what do they rely on to decide if you get accommodations or not? They'll look on the whole record. So if you have, you know, throughout elementary school, high school, college, various assessments of you and test scores, and the truth is you don't really need to go looking that hard to see the people with real reading disabilities. They don't do well on standardized tests, which include a lot of reading. I mean, they don't score in the 99th percentile in the ACT. They struggle reading, and so you would see that. They're probably not going to be in med school. What? They're probably not going to be in med school. They're not going to be in med school, a lot of them. Do you know what percentage, roughly, are granted on this exam, accommodations? You said there were thousands. Someone said there were thousands of requests. I don't know offhand. Your Honor, it was somewhere above 50%. Above 50? Above 50 are granted? I will leave with this. Unless you have other questions, I'm happy to try and answer them. What studies are showing is that we see a disproportionate rate of accommodations among wealthier kids going to selective, expensive private schools. Is this all in the record? This is in studies. It's not in the record. So. Do we conclude today's arguments?